**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS FOR THE NINTH CIRCUIT

| | |
|---|---|
| SIMON AND SIMON, PC; VIP DENTAL SPAS,<br>*Plaintiffs - Appellants*,<br>v.<br>ALIGN TECHNOLOGY, INC.,<br>*Defendant - Appellee*. | No. 24-1703<br>D.C. No. 3:20-cv-03754-VC<br>OPINION |
| MISTY SNOW; EMILY VO; KATIE CAMPBELL; CECELIA GARAY; CELESTE HAMILTON; STEPHANIE RICKENBAKER; ANGELA CARNAGHI; JENNIFER EZZIO; JAIME GOOCH; TRACY MOUND; JUSTIN HANSEN; ELISABETH SKIBBA,<br>*Plaintiffs - Appellants*,<br>v.<br>ALIGN TECHNOLOGY, INC.,<br>*Defendant - Appellee*. | No. 24-1783<br>D.C. No. 3:21-cv-03269-VC |

Appeal from the United States District Court
for the Northern District of California
Vince Chhabria, District Judge, Presiding

Argued and Submitted April 10, 2025
San Francisco, California

Filed October 5, 2026

Before: Sidney R. Thomas, Richard A. Paez, and Eric D. Miller, Circuit Judges.

Per Curiam Opinion;
Concurrence by Judge Miller

## SUMMARY*

**Antitrust**

The panel reversed the district court's summary judgment in favor of Align Technology, Inc., and remanded in antitrust class actions brought by two groups of plaintiffs under section 2 of the Sherman Act, 15 U.S.C. § 2.

Plaintiffs alleged that Align, maker of a dental aligner known as Invisalign and a handheld intraoral scanner called iTero, engaged in an anticompetitive scheme to monopolize the aligner and scanner markets. Plaintiffs alleged that Align refused to deal with its competitor by terminating a digital

* This summary constitutes no part of the opinion of the court. It has been prepared by court staff for the convenience of the reader.

interoperability agreement between Invisalign and TRIOS, a rival intraoral scanner made by 3Shape.

The panel held that under the burden-shifting framework applied in section 2 cases under the Sherman Act, including refusals to deal, a plaintiff must first establish a prima facie case of anticompetitive conduct. At step two, the burden shifts to the defendant to provide a procompetitive, nonpretextual business justification for its refusal to deal. At step three, the burden shifts back to the plaintiff to rebut the asserted justification, either as not legitimately procompetitive or as pretextual. If the plaintiff cannot rebut the justification, then the plaintiff must demonstrate that the anticompetitive harm of the refusal to deal outweighs any procompetitive effect.

The panel held that at step one, plaintiffs established a prima facie case. The market at issue was the aligner market. As to this market, all three *Aspen Skiing* factors were satisfied. Align unilaterally ended a voluntary and profitable course of dealing when it terminated interoperability with 3Shape; it refused to sell at the prevailing retail price; and it refused to provide 3Shape with products that were already sold in a retail market to other customers.

At step two, Align met its burden by asserting that it terminated interoperability to strengthen its position in patent litigation against 3Shape.

At step three, the panel held that plaintiffs presented sufficient evidence to create genuine disputes of material fact over whether Align's proffered justification was legitimately procompetitive. Plaintiffs also presented sufficient evidence to create genuine disputes of material

fact over whether Align's proffered justification was pretextual.

Concurring in the judgment, Judge Miller wrote that the court's opinion made a significant and unwarranted expansion of refusal-to-deal liability by holding that a plaintiff can prevail whenever a jury thinks that the anticompetitive harm of the refusal to deal outweighs any competitive benefit. Judge Miller nonetheless concluded that plaintiffs presented sufficient evidence to create a genuine dispute of material fact on whether Align's proffered justification for terminating interoperability was pretextual. He therefore agreed with the decision that the district court erred in granting summary judgment to Align on the section 2 refusal-to-deal claim and that the case should be remanded for trial. But because he did not agree with the expansion of the legal standard for refusal-to-deal claims, he concurred only in the judgment.

---

## COUNSEL

Joshua P. Davis (argued) and Matthew I. Summers, Berger Montague PC, San Francisco, California; Joseph E. Samuel Jr. and Eric L. Cramer, Berger Montague PC, Philadelphia, Pennsylvania; Rio S. Pierce (argued), Hagens Berman Sobol Shapiro LLP, Berkeley, California; Steve W. Berman, Theodore Wojcik, and Joseph M. Kingerski, Hagens Berman Sobol Shapiro LLP, Seattle, Washington; John Radice and April Lambert, Radice Law Firm PC, Princeton, New Jersey; for Plaintiffs-Appellants.

Kannon K. Shanmugam (argued), Anna J. Goodman, Anna P. Lipin, Brian M. Lipshutz, and James Durling, Paul Weiss

Rifkind Wharton & Garrison LLP, Washington, D.C.; Thomas A. Counts, Paul Hastings LLP, San Francisco, California; Adam M. Reich, Paul Hastings LLP, Chicago, Illinois; James M. Pearl and Emma Farrow, Paul Hastings LLP, Los Angeles, California; Michael F. Murray, Paul Hastings LLP, Washington, D.C.; Noah B. Pinegar, Paul Hastings LLP, New York, New York; Michael Whalen, Kirkland & Ellis LLP, Chicago, Illinois; for Defendant-Appellee.

Patrick M. Kuhlmann (argued), Daniel E. Haar, Nickolai G. Levin, and John J. Sullivan, Attorneys, Antitrust Division; Alice A. Wang and Spencer D. Smith, Counsels to the Assistant Attorney General; David B. Lawrence, Policy Director; John W. Elias, Deputy Assistant Attorney General; Doha G. Mekki, Principal Deputy Assistant Attorney General; Jonathan S. Kanter, Assistant Attorney General; United States Department of Justice, Washington, D.C.; for Amicus Curiae United States of America.

Kathleen W. Bradish and David O. Fisher, American Antitrust Institute, Washington, D.C., for Amicus Curiae American Antitrust Institute.

Matthew J. Dowd, Dowd Scheffel PLLC, Washington, D.C., for Amicus Curiae the Honorable Paul R. Michel.

Gregory J. Werden, Arlington, Virginia, for Amicus Curiae Gregory J. Werden.

## OPINION

PER CURIAM:

Two groups of plaintiffs filed antitrust class actions against Align Technology, Inc., the maker of a popular dental aligner known as Invisalign and a handheld intraoral scanner called iTero. Plaintiffs claimed that as part of an anticompetitive scheme to monopolize the aligner and scanner markets in violation of section 2 of the Sherman Act, 15 U.S.C. § 2, Align refused to deal with its competitor by terminating a digital interoperability agreement between Invisalign and a rival intraoral scanner. The district court granted summary judgment to Align, reasoning that although Align may have been motivated in part by a desire to harm its competitor, its action was also based in part on a legitimate business justification.

This was an incomplete application of the burden-shifting framework applied in section 2 cases under the Sherman Act, including refusals to deal. At step one, a plaintiff must establish a prima facie claim of anticompetitive conduct. The *Aspen Skiing* factors are especially probative of this inquiry in the refusal to deal context, but as the district court recognized, they are not a rigid list of elements. At step two, the burden shifts to the defendant to provide a procompetitive, nonpretextual business justification for its refusal to deal. At step three, the burden shifts back to the plaintiff to rebut the asserted justification, either as not legitimately procompetitive or as pretextual. If the plaintiff cannot rebut the justification, then the plaintiff must demonstrate that the anticompetitive harm of the refusal to deal outweighs any procompetitive benefit.

The district court erred in granting summary judgment because Plaintiffs have presented sufficient evidence to create genuine disputes of material fact over whether Align's proffered justification was legitimately procompetitive and whether it was pretextual. Either of these grounds would be sufficient for Plaintiffs' claims to proceed to trial. We therefore reverse and remand.

I

Align sells Invisalign, a dental aligner that replaces traditional braces and corrects the misalignment of teeth using a series of clear, removable appliances that gradually shift teeth to the desired position. Producing those appliances requires precise measurements of a patient's mouth, so Align also sells iTero, a handheld scanner that allows dentists to take digital impressions of teeth. Align's products are digitally integrated: iTero's software allows dentists to submit scans directly to Align to place Invisalign orders. While iTero can be used to order non-Invisalign aligners, the process is costly and cumbersome, so iTero and Invisalign effectively constitute a closed system.

Align is a major player in both the aligner and scanner markets. As a pioneer in clear aligners, Align holds hundreds of patents related to Invisalign, allowing it to occupy a market-leading position. During the period at issue in this case, Align controlled about ninety percent of the aligner market in the United States. With iTero, Align also leads the market for intraoral scanners, especially those that take digital images for making aligners.

Align has enabled digital interoperability between Invisalign and a few competing scanners. For example, Align has agreed to make Invisalign compatible with 3M's True Definition scanner and Dentsply Sirona's CEREC

Omnicam scanner. In December 2015, Align also entered into an agreement with 3Shape to make 3Shape's TRIOS scanner interoperable with Invisalign. TRIOS is designed to be an open system that can be used to order aligners from different manufacturers. Align considers 3Shape to be its main competitor in the scanner market.

Align's agreement with 3Shape allowed both parties to terminate at will and preserved Align's intellectual property rights, including its United States patents. During negotiations for the agreement and throughout the period of interoperability, Align asked 3Shape several times to make TRIOS compatible exclusively with Invisalign. 3Shape rejected those proposals, citing its commitment to an open system.

Align and 3Shape's partnership was short-lived. In December 2017, with one year remaining in the agreement, Align announced that it was terminating interoperability and would "no longer be able to accept digital scans for new Invisalign treatment and/or retention cases from TRIOS scanners in the United States." While the majority of Invisalign orders continued to be placed through Align's own iTero scanner, 3Shape's TRIOS scanner represented a growing and popular non-iTero channel. Around the same time, several key patents related to Invisalign's technology were set to expire, and Align was concerned about growing competition in the clear-aligner market once those patents expired. In particular, Align worried that open-system scanners like TRIOS could be used to order other clear aligners that would cut into Align's market share. Align continued to accept digital scans from TRIOS outside of the United States, where interoperability did not terminate.

About a month before it terminated the agreement, Align filed six patent actions against 3Shape with the United States International Trade Commission and in federal district court, asserting infringement of twenty-six patents related to intraoral scanning. Align publicly stated that it would no longer "accept scans from US-based TRIOS scanners that infringe our patents." Align and 3Shape ultimately settled the patent litigation. In the meantime, Align's interoperability agreements with 3M and Dentsply Sirona remained intact.

Align also sought to increase Invisalign sales through promotional programs and agreements. In one such program, known as "Fusion," Align gave significant discounts on iTero scanners to dental providers who committed to submitting a minimum number of Invisalign cases annually for three years. In addition, Align negotiated promotional agreements with individual dental practices and dental service organizations, which manage multiple dental practices. Those agreements contained exclusivity clauses committing purchasers—including two of the largest dental service organizations in the country—to Align for several years.

In 2020, two dental practices led by Simon & Simon, PC (Simon) brought a class action on behalf of dental practices that purchased aligners and scanners directly from Align. Simon alleged that Align violated section 2 of the Sherman Act by engaging in an anticompetitive scheme to monopolize the aligner and scanner markets. Simon described Align's scheme as encompassing the unilateral termination of Align's interoperability agreement with 3Shape as well as exclusive contracts, illegal bundling, and other objectionable programs. The district court denied Align's motion to dismiss.

In 2021, Misty Snow and fifteen individuals who purchased Invisalign aligners for personal use (Snow) brought their own class action on behalf of themselves and other consumers. Like Simon, Snow alleged that Align engaged in an anticompetitive scheme to monopolize the aligner and scanner markets. Specifically, Snow claimed that the scheme consisted of three components: (1) the unilateral termination of the interoperability agreement with 3Shape, (2) the Fusion program, which bundled Invisalign and iTero sales, and (3) exclusive contracts. Snow asserted violations of section 2. She also asserted claims under analogous state antitrust laws, allowing her to seek damages unavailable under federal law to indirect purchasers, such as consumers who purchased Invisalign from their dentists rather than directly from Align. *See Ill. Brick Co. v. Illinois*, 431 U.S. 720, 746 (1977). The district court denied Align's motion to dismiss in relevant part.

The district court consolidated the cases and granted Simon's and Snow's (Plaintiffs') motions for class certification, certifying a nationwide damages class of direct aligner purchasers, a nationwide injunctive-relief class of indirect aligner purchasers, and damages classes of indirect aligner purchasers in ten States.

Align then moved for summary judgment on the section 2 claims in both cases and the corresponding state-law claims in the Snow case. Align argued that it terminated interoperability not for anticompetitive reasons but because continuing interoperability could have weakened its position in the patent litigation by allowing 3Shape to assert various equitable defenses. During discovery, Align asserted the attorney-client privilege and objected to an interrogatory about the reason for terminating interoperability, and during the deposition of its Chief Executive Officer (CEO), it

objected on the same ground to questions about its decision-making process. The district court sustained Align's claims of privilege. Plaintiffs then moved to preclude "Align's argument that it terminated interoperability to protect its patent interests." But the district court denied that motion, explaining that the legitimacy of Align's business justification could likely "be adjudicated without reference to privileged materials." At summary judgment, without access to the privileged information, Plaintiffs primarily relied on the testimony of their patent expert and on circumstantial evidence to argue that Align's patent justification was pretextual.

The district court granted summary judgment to Align. Quoting the American Bar Association's model jury instructions, the court held that "[a] refusal to deal that is based in part on legitimate business reasons does not violate the antitrust laws, even if it is also motivated by the desire to harm competitors or does in fact harm competitors." American Bar Ass'n, *Model Jury Instructions in Civil Antitrust Cases*, ch. 3.B.2, at 129 (2016). The court observed that "termination of the interoperability agreement was bound up in Align's decision to initiate intellectual property litigation against 3Shape" because the litigation "raised the possibility that 3Shape would assert affirmative defenses . . . based partly on the fact that Align had been, and continued to be, in a business arrangement with 3Shape that involved the use of the allegedly-infringing scanners." It concluded that "no reasonable jury could reject the notion that termination of the agreement was based 'in part' on legitimate business reasons."

## II

### A. Legal Background

Section 2 of the Sherman Act makes it unlawful to "monopolize, or attempt to monopolize, or combine or conspire with any other person or persons, to monopolize any part of the trade or commerce among the several States, or with foreign nations." 15 U.S.C. § 2. Simply possessing "monopoly power in the relevant market" does not violate section 2. *United States v. Grinnell Corp.*, 384 U.S. 563, 570–71 (1966). A section 2 violation also requires "willful acquisition or maintenance of that power as distinguished from growth or development as a consequence of a superior product, business acumen, or historic accident." *Id.* In other words, "the possession of monopoly power will not be found unlawful unless it is accompanied by an element of anticompetitive *conduct*." *Verizon Commc'ns Inc. v. Law Offs. of Curtis V. Trinko, LLP*, 540 U.S. 398, 407 (2004).

This case involves allegations of anticompetitive conduct in the form of one business's refusal to deal with a rival. As a general matter, businesses enjoy the right to refuse to deal with anyone, including their rivals. "In the absence of any purpose to create or maintain a monopoly," the Sherman Act "does not restrict the long recognized right of [a] trader or manufacturer engaged in an entirely private business, freely to exercise his own independent discretion as to parties with whom he will deal." *United States v. Colgate & Co.*, 250 U.S. 300, 307 (1919). Such refusals—even when they are made with the intent to harm competitors—often reflect "vigorous competition" that promotes consumer welfare. *Novell, Inc. v. Microsoft Corp.*, 731 F.3d 1064, 1078 (10th Cir. 2013) (Gorsuch, J.).

Nevertheless, the right to refuse to deal is "not unqualified." *Aspen Skiing Co. v. Aspen Highlands Skiing Corp.*, 472 U.S. 585, 601 (1985). The Supreme Court has recognized narrow circumstances in which "a refusal to cooperate with rivals can constitute anticompetitive conduct and violate § 2." *Trinko*, 540 U.S. at 408; *see Otter Tail Power Co. v. United States*, 410 U.S. 366, 374–75 (1973).

The leading refusal-to-deal case is *Aspen Skiing*. There, Ski Co., the owner of three ski resorts in Aspen, Colorado, ceased offering an all-Aspen lift ticket that included access to a fourth, rival ski resort, Aspen Highlands (Highlands). 472 U.S. at 587–93. In its place, Ski Co. offered a three-resort ticket that excluded Highlands. *Id.* at 593–95. Highlands sued Ski Co. under section 2, and the jury was instructed that "if there were legitimate business reasons for the refusal" of Ski Co. to continue to deal with Highlands, "then the defendant . . . has not violated the law." *Id.* at 597. The jury found for Highlands, thereby determining "that there were no valid business reasons for the refusal." *Id.* at 604–05.

The Supreme Court agreed that a reasonable jury could have concluded, based on the evidence, that Ski Co. violated section 2. *Id.* at 608. Ski Co. claimed that it terminated the all-Aspen ticket because usage could not be properly monitored, the system was administratively cumbersome, and Highlands offered inferior skiing services with which Ski Co. did not wish to be associated. *Id.* at 608–10. But Highlands offered evidence contradicting each of those proffered business reasons, and the jury credited Highlands's evidence. *Id.* Accordingly, the Court concluded that Ski Co. had failed "to offer any efficiency justification whatever for its pattern of conduct," *id.* at 608, and that it "was not motivated by efficiency concerns" but "was apparently

motivated entirely by a decision to avoid providing any benefit to Highlands," *id.* at 610.

In *MetroNet Services Corp. v. Qwest Corp.*, we identified three circumstances present in *Aspen Skiing* that the Supreme Court has "found significant" in analyzing refusal-to-deal claims. 383 F.3d 1124, 1132–33 (9th Cir. 2004). They include (1) "the unilateral termination of a voluntary and profitable course of dealing," (2) "the defendant's refusal to sell to the plaintiff at the prevailing retail price, . . . [which] indicated a willingness to sacrifice short-term benefits in order to obtain higher profits in the long run from the exclusion of competition," and (3) the defendant's refusal "to provide to . . . competitors products that were already sold in a retail market to other customers." *Id.*

Nonetheless, as the district court pointed out, "[t]here is indeed confusion in the case law" on the proper legal framework at the summary judgment stage. Because we remand this case for further proceedings, we take this opportunity to clarify the three-step framework.

### B. Burden-Shifting Framework

To make out a refusal-to-deal claim under section 2, a plaintiff must first establish a prima facie case of anticompetitive conduct. The *Aspen Skiing* factors are a starting point for this inquiry. A plaintiff must put forward at least one of these factors, but courts should consider them flexibly, "on a case-by-case basis, focusing on the 'particular facts disclosed by the record.'" *Eastman Kodak Co. v. Image Tech. Servs., Inc.*, 504 U.S. 451, 467 (1992) (*Kodak*). That is, while a plaintiff cannot establish a prima facie case when *none* of the factors are present, these factors do not impose a rigid checklist on all refusal-to-deal plaintiffs in all

industries. *FTC v. Qualcomm Inc.*, 969 F.3d 974, 995 (9th Cir. 2020); *see also Viamedia, Inc. v. Comcast Corp.*, 951 F.3d 429, 457 (7th Cir. 2020).

Second, after the plaintiff has established a prima facie case, the burden shifts to the defendant to provide a legitimate business justification for its conduct. *See Aspen Skiing*, 472 U.S. at 608; *Kodak*, 504 U.S. at 483; *Qualcomm*, 969 F.3d at 991. A legitimate business justification is "a nonpretextual claim that [the defendant's] conduct is indeed a form of competition on the merits because it involves, for example, greater efficiency or enhanced consumer appeal." *Qualcomm*, 969 F.3d at 991 (quoting *United States v. Microsoft Corp.*, 253 F.3d 34, 59 (D.C. Cir. 2001) (en banc) (per curiam)).

Third, if the defendant makes this showing, the plaintiff may rebut the asserted justification by showing that it "does not legitimately promote competition *or* that the justification is pretextual." *Image Tech. Servs., Inc. v. Eastman Kodak Co.*, 125 F.3d 1195, 1212 (9th Cir. 1997) (*Image Tech. Servs.*) (emphasis added). The plaintiff can do so by pointing to direct or circumstantial evidence, including evidence of the defendant's anticompetitive intent. *See Aspen Skiing*, 472 U.S. at 602–03. Whether a justification is legitimately procompetitive is a separate inquiry from whether it is pretextual, though in certain circumstances, the same evidence can support both showings. If, however, "the plaintiff cannot rebut the monopolist's procompetitive justification, 'then the plaintiff must demonstrate that the anticompetitive harm of the conduct outweighs the procompetitive benefit.'" *Qualcomm*, 969 F.3d at 991 (quoting *Microsoft*, 253 F.3d at 59); *see also Kodak*, 504 U.S. at 486; *Viamedia*, 951 F.3d at 462, 464. This inquiry incorporates the "rule of reason," a "balancing approach" to

"consider[] whether the monopolist's conduct on balance harms competition." *Microsoft*, 253 F.3d at 59. This term was first used by the Supreme Court "to describe the proper inquiry under both sections of the [Sherman] Act." *Id.* (citing *Standard Oil Co. of N.J. v. United States*, 221 U.S. 1, 61–62 (1911)). We have also held that "the three-part burden-shifting test under the rule of reason is essentially the same" for section 1 and section 2 cases. *Qualcomm*, 969 F.3d at 991 (citing *Standard Oil*, 221 U.S. at 61–62 and *Microsoft*, 253 F.3d at 58–59).

We consider each prong of the third step of the framework in turn: whether a justification legitimately promotes competition, whether it is pretextual, and whether "the anticompetitive harm of the conduct outweighs the procompetitive benefit." *Qualcomm*, 969 F.3d at 991 (quoting *Microsoft*, 253 F.3d at 59).

1. Whether the Justification Legitimately Promotes Competition

The district court did not fully address the first method by which a plaintiff can rebut a defendant's justification at step three: by showing that it "does not legitimately promote competition." *Image Tech. Servs.*, 125 F.3d at 1212; *see also Aspen Skiing*, 472 U.S. at 585 n.39 (recognizing that "evidence that the conduct was not related to any apparent efficiency" supports a refusal-to-deal claim) (quoting Robert H. Bork, *The Antitrust Paradox* 157 (1978) (emphasis omitted)).

This rebuttal method can rely on evidence of the asserted justification's lack of procompetitive effects. *Cf. Image Tech. Servs.*, 125 F.3d at 1218 (requiring that "the jury account for the procompetitive effects" of the intellectual property laws when they are asserted as a business

justification "[u]nder the fact-based approaches of *Aspen Skiing* and *Kodak*"); *Oahu Gas Serv., Inc. v. Pac. Res., Inc.*, 838 F.2d 360, 368–69 (9th Cir. 1988) (finding that the defendant's refusal to produce propane because it "would have resulted in a negative return" given "then-existing price controls" was legitimately procompetitive).

2. Whether the Justification Is Pretextual

The district court correctly articulated the second method by which a plaintiff may rebut a defendant's justification at step three: by demonstrating that the proffered "justification is pretextual." *Image Tech. Servs.*, 125 F.3d at 1212. Before the district court, Align argued that a defendant is not liable if it can identify any conceivable justification for its conduct, even if the record does not show that the defendant was motivated by that justification. At oral argument, Align effectively abandoned this broad reading of *Aerotec Int'l, Inc. v. Honeywell Int'l, Inc.*, 836 F.3d 1171, 1184 (9th Cir. 2016). We agree that the district court rightly rejected this standard as "a test akin to rational basis review of economic legislation under the Equal Protection Clause." *See FCC v. Beach Commc'ns, Inc.*, 508 U.S. 307, 315 (1993) ("[B]ecause we never require a legislature to articulate its reasons for enacting a statute, it is entirely irrelevant for constitutional purposes whether the conceived reason for the challenged distinction actually motivated the legislature."). Although the proffered business justification need not be the only reason for the defendant's decision, it must be a real one.

3. Consideration of Disproportionate Anticompetitive Harm

The district court did not address the role of disproportionate anticompetitive harm in the third step of the

framework. We address it here to provide guidance to the district court on remand, as the parties hotly dispute this issue.[1] Align first argues that "balancing . . . has no basis in this [c]ourt's precedents," relying on *Qualcomm*. True, we did not weigh procompetitive benefit and anticompetitive harm in the refusal-to-deal claim in *Qualcomm*. But in *Qualcomm*, the plaintiff failed to establish a prima facie refusal-to-deal claim in the first instance. Therefore, there was no need to consider the defendant's proffered business justification at step two or any other related issue at step three. *Qualcomm*, 969 F.3d at 991. Thus, we had no occasion to consider whether the plaintiff could introduce "balancing" evidence. Nonetheless, we unequivocally suggested that the rule of reason applies to section 2 refusal-to-deal claims in the following passage:[2]

> [I]f a plaintiff successfully establishes a prima facie case under § 2 by demonstrating anticompetitive effect, then the monopolist may proffer a procompetitive justification for its conduct. If the monopolist asserts a procompetitive justification—a

[1] Simon, Snow, the government as amicus curiae, and the American Antitrust Institute as amicus curiae each propose slightly different iterations of a burden-shifting framework with "balancing." We agree that the case law and the leading antitrust treatise support a fact-intensive framework. To the extent the government argues that disproportionate anticompetitive harm should be considered at step two, we disagree. Under *Qualcomm*, it is appropriately considered at step three. 969 F.3d at 991.

[2] The court in *Qualcomm* identified other differences between the tests for section 1 and section 2 claims, without any indication that the rule of reason was not implicated in refusal-to-deal section 2 claims. 969 F.3d at 991–92.

> nonpretextual claim that its conduct is indeed a form of competition on the merits because it involves, for example, greater efficiency or enhanced consumer appeal—then the burden shifts back to the plaintiff to rebut that claim. If the plaintiff cannot rebut the monopolist's procompetitive justification, then the plaintiff must demonstrate that the anticompetitive harm of the conduct outweighs the procompetitive benefit.

969 F.3d at 991 (internal quotation marks and citations omitted). We hold, as *Qualcomm* implied, that the rule of reason is part of our refusal-to-deal framework. *Trinko*, which pre-dated *Qualcomm*, did not create a carve-out for refusal-to-deal cases from the rule of reason; it simply held that refusal-to-deal claims must "fit within the limited exception recognized in *Aspen Skiing*," *Trinko*, 540 U.S. at 409. This holding is not inconsistent with the application of the rule of reason. Indeed, the Supreme Court suggested in *Kodak* that the rule of reason applies to refusal-to-deal claims. 504 U.S. at 486 (acknowledging that Kodak may prevail at trial in a case with a refusal-to-deal claim, as "[i]t may be that . . . any anti-competitive effects of Kodak's behavior are outweighed by its competitive effects"); *see also Aspen Skiing*, 472 U.S. at 605 (recognizing that "it is relevant to consider" whether the defendant's conduct "impaired competition in an unnecessarily restrictive way"). We agree with the Seventh Circuit that for refusal-to-deal claims, just like other section 2 claims, "considering both procompetitive benefits and anticompetitive harms is

necessary to answer the ultimate question of whether competition was harmed."[3] *Viamedia*, 951 F.3d at 462.

Align next argues that this approach defies "sound principles of antitrust policy," citing Areeda and H. Hovenkamp for the proposition that "[c]ourts do not 'balanc[e] . . . the social gains from refusing to deal or cooperate with rivals based on legitimate business purposes against the losses resulting from that refusal.'" In full, however, Areeda and H. Hovenkamp state as follows:

> [T]he [Supreme] Court [in *Aspen Skiing*] did not call for any balancing of the social gains

[3] The concurrence dismisses the discussion of balancing in *Viamedia, Inc. v. Comcast Corp.*, 951 F.3d 429 (7th Cir. 2020), as unnecessary to the result, essentially dicta. We respectfully disagree with the concurrence: *Viamedia*'s reasoning about balancing was a holding necessary to its disposition of the appeal. In *Viamedia*, the defendant argued that one ground to affirm the district court's judgment on the refusal-to-deal theory in its favor was that "[t]here is no 'balancing' of benefits and harms." 951 F.3d at 461. The Seventh Circuit rejected that argument and held that refusal-to-deal claims under section 2 are "rule of reason cases." *Id.* at 463. And one ground for reversing the district court's grant of judgment on the pleadings on this theory, the court said, was that "the calculation of procompetitive benefits net of anticompetitive harms does not easily lend itself to a *pleading* standard." *Id.* at 462. If there were any doubt, the Seventh Circuit explicitly directed that on remand, "the remainder of the case should settle into the traditional analysis followed in rule of reason cases"—including, if appropriate, that the plaintiff "demonstrate that the anticompetitive harm of the conduct outweighs the procompetitive benefit." *Viamedia*, 951 F.3d at 463–64 (internal quotation marks and citation omitted). The concurrence also contends that the Seventh Circuit and other courts of appeals have not "read *Viamedia* to establish such a rule." We are not aware of any refusal-to-deal case, or even any section 2 case, in any appellate court at the summary judgment stage that has declined to follow *Viamedia*.

> from refusing to deal or cooperate with rivals based on legitimate business purposes against the losses resulting from that refusal. Rather, the Court classified conduct or intention as either lawful or not on the basis of the presence or absence of legitimate business purposes. Of course, the Court's proposition generates several subordinate questions.

3B Philip E. Areeda & Herbert Hovenkamp, *Antitrust Law: An Analysis of Antitrust Principles & Their Applications* ¶ 772c2 (5th ed. 2022)). We agree that the Supreme Court did not address "balancing" in *Aspen Skiing*, as it was not presented with the issue. The Supreme Court decided *Aspen Skiing* based on whether the evidence presented at trial supported the jury's conclusion that no "valid business reasons" justified Ski Co.'s conduct, not on whether evidence of disproportionate anticompetitive harm could have supported Highland's claim. 472 U.S. at 605. After acknowledging the Court's holding in *Aspen Skiing*, Areeda and H. Hovenkamp proceed to list further questions generated by that case. Areeda & H. Hovenkamp, *supra*, ¶ 772c2. They then express that, in their view,

> [c]ondemnation [for a refusal-to-deal claim under section 2] would be appropriate only for conduct that (1) clearly injures an actual or prospective rival either (2a) with no good business justification at all, or (2b) *with a business justification that is poorly fitted to*

> *the result or wholly disproportionate to the harm that is inflicted.*

*Id.* (emphasis added). With this language, Areeda and H. Hovenkamp make it clear that consideration of "wholly disproportionate . . . harm" in our refusal-to-deal framework is a proper inquiry. *See also Viamedia*, 951 F.3d at 461 n.13.

We recognize that an interest in harming rivals "is virtually always present" in business decisions, Areeda & H. Hovenkamp, *supra*, ¶ 773f, and that businesses often make decisions that harm their competitors. That's why our burden-shifting framework considers disproportionate harm to "*competition*, not *competitors*." *Qualcomm*, 969 F.3d at 993 (quoting *Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.*, 429 U.S. 477, 488 (1977)). While *Trinko* described *Aspen Skiing* as "at or near the outer boundary of § 2 liability,"[4] 540 U.S. at 409, the Court neither overruled *Aspen Skiing* nor required federal courts to adopt evidentiary requirements that render it "virtually impossible [for refusal-to-deal

[4] We agree with amicus curiae American Antitrust Institute's argument, relying on Erik Hovenkamp, *The Antitrust Duty to Deal in the Age of Big Tech*, 131 Yale L.J. 1483, 1502–07 (2022), that the concerns motivating the Court in *Trinko* are not present here. *Trinko* dealt with a "primary" refusal to deal, in which Verizon was alleged to have used its monopoly power in its primary market (local phone networks) to refuse to aid competitors in that same market. This case, by contrast, addresses a "secondary" refusal to deal, as Align is alleged to have used its monopoly power in its primary market (aligners) to refuse to deal in a secondary market (oral scanners). *See also* Areeda & H. Hovenkamp, *supra*, ¶ 771c (explaining why "antitrust analysis would be greatly improved if the courts recognized a more robust distinction between 'primary' and 'secondary' refusals to deal"). This distinction addresses the concurrence's concern about refusal-to-deal liability potentially facilitating collusion, disincentivizing competition, or forcing courts to act as central planners.

plaintiffs] to win." *See* Erik Hovenkamp, *The Antitrust Duty to Deal in the Age of Big Tech*, 131 Yale L.J. 1483, 1497 & 1497 n.71 (2022); *see also Viamedia*, 951 F.3d at 455.

We clarify only what is likely obvious from our case law in this area: that "the three-part burden-shifting test under the rule of reason [that] is essentially the same" for section 1 and section 2 claims also applies to section 2 refusal-to-deal claims. *Qualcomm*, 969 F.3d at 991; *cf. Viamedia*, 951 F.3d at 461 n.13 ("Otherwise we could arrive at absurd outcomes . . . 'an act might benefit the defendant very slightly while doing considerable harm to the rest of the economy, and it would be lawful.'") (quoting Areeda & H. Hovenkamp, *supra*, ¶ 651b3).

## III

With those principles in mind, we consider whether the district court's grant of summary judgment was appropriate. We review the district court's decision de novo, viewing the evidence in the light most favorable to Plaintiffs as the non-moving parties to determine whether there are any genuine issues of material fact. *See Teradata Corp. v. SAP SE*, 124 F.4th 555, 572 (9th Cir. 2024).

### A. Market Definition

We note at the outset that the parties disagree over the definition of the relevant market. Align contends that interoperability, not the Invisalign aligner, is the product in question, and that it has never sold interoperability in an existing market. That is unpersuasive. Like the all-Aspen pass in *Aspen Skiing*, interoperability is merely a means of delivering the product to the customer; it is not the product itself. *See Trinko*, 540 U.S. at 410 (describing the product in *Aspen Skiing* as "lift tickets representing a bundle of services

to skiers”). Interoperability facilitates the market for Invisalign sales through non-iTero scanners, in which the product being sold at retail price is the Invisalign aligner. Thus, for our purposes, the market at issue is the aligner market.

### B. Applying the Burden-Shifting Framework

Turning to Plaintiffs’ refusal-to-deal claim, we apply the three-step framework, beginning with step one. While the *Aspen Skiing* factors are not the exclusive method by which a plaintiff may make out a prima facie case, it is abundantly clear that Plaintiffs have established a prima facie case. All three *Aspen Skiing* factors are satisfied.[5]

First, Align unilaterally ended a “voluntary and profitable course of dealing” when it terminated interoperability with 3Shape. *MetroNet*, 383 F.3d at 1132. The report by Plaintiffs’ economic expert established that Align’s agreement with 3Shape was profitable for Align. Align argues that its business relationship with 3Shape did not amount to a “course of dealing” and was at most a “one-off, short-term agreement.” But Align and 3Shape had intended for their agreement to be in place for a minimum

---

[5] The concurrence asserts that, under this opinion, “a plaintiff can prevail whenever a jury thinks ‘the anticompetitive harm of the refusal to deal outweighs any competitive benefit.’” Not so. Rather than expanding refusal-to-deal liability, we simply clarify a framework that recognizes that “*Aspen Skiing* is at or near the outer boundary of § 2 liability.” *Verizon Commc’ns Inc. v. Law Offs. of Curtis V. Trinko, LLP*, 540 U.S. 398, 409 (2004). Indeed, to defeat summary judgment, a plaintiff must still establish anticompetitive conduct, guided by the *Aspen Skiing* factors, as well as the other elements of a section 2 claim. In any event, we do not share the same implied doubts about a jury’s ability to faithfully apply the rule of reason, which juries routinely apply in antitrust litigation.

specified period, and Align had also entered into similar agreements with other scanner companies, suggesting that it viewed such agreements as a standard business practice for interoperability. More importantly, there is no minimum length of time or number of agreements for an existing business relationship to qualify as a course of dealing in this context. The "course of dealing" factor merely ensures that the defendant "was already in the business of providing a service" or good so that the courts need not "act as central planners, identifying the proper price, quantity, and other terms of dealing." *Trinko*, 540 U.S. at 408, 410. Align's collaboration with multiple companies reflects an existing channel for Invisalign sales through non-iTero scanners, and its specific agreement with 3Shape was a voluntary and profitable business relationship that qualified as a course of dealing in the dental aligner market.

Second, after terminating interoperability, Align refused to sell "at the prevailing retail price, . . . indicat[ing] a willingness to sacrifice short-term benefits in order to obtain higher profits in the long run from the exclusion of competition." *MetroNet*, 383 F.3d at 1132. Plaintiffs presented evidence that during the period of interoperability, Align was compensated at retail price for Invisalign aligners that were sold using 3Shape's TRIOS scanners. By terminating interoperability, Align chose to forgo these additional sales and close an important retail channel.

Third, Align refused to provide 3Shape with "products that were already sold in a retail market to other customers." *MetroNet*, 383 F.3d at 1133. Because Align maintained interoperability agreements with at least two other scanner companies, it was willing to sell Invisalign aligners through non-iTero scanners. Its refusal to sell Invisalign aligners through 3Shape scanners therefore "single[d]

out . . . [3Shape] for anticompetitive treatment." *Qualcomm*, 969 F.3d at 995. Align also chose to terminate interoperability with 3Shape only in the United States and not in other countries. *See Aspen Skiing*, 472 U.S. at 603 n.30 (observing that the defendant participated in interchangeable ticket programs in other regions but not in Aspen). Because Align continued to sell its products through non-iTero channels outside of the United States, "it seems appropriate to infer that such [sales] satisfy consumer demand in free competitive markets." *Id.* at 603.

Plaintiffs have thus carried their initial burden at summary judgment to establish a prima facie claim based on Align's anticompetitive conduct.

At step two, where the burden shifts to the defendant to offer a business justification, Align asserted that it terminated interoperability to strengthen its position in patent litigation against 3Shape. We are satisfied that Align has met its burden.

Turning to step three, the district court determined that Align's enforcement of its patent rights was a "presumptively valid business justification." Plaintiffs did not argue that Align's patent litigation was a sham, and because Align's patent claims against 3Shape were not "so low in value as to make litigating them irrational," the district court concluded that "termination of the agreement was based 'in part' on legitimate business reasons." We disagree. Below, we analyze the genuine disputes of material fact established by Plaintiffs on rebuttal regarding whether Align's justification legitimately promoted competition and whether it was pretextual. Because evidence of disproportionate anticompetitive harm is only considered at step three "[i]f the plaintiff cannot rebut the monopolist's []

justification," we need not consider this evidence at this stage of the litigation. *See Qualcomm*, 969 F.3d at 991.

1. Whether the Justification Legitimately Promotes Competition

At summary judgment on step three, Plaintiffs have the burden to provide sufficient evidence from which a reasonable factfinder could infer that Align's justification did not legitimately promote competition. We agree that Align's proffered justification—that is, its interest in protecting its patent rights—is entitled to the "presumption" that it was "legitimately procompetitive." *Image Tech. Servs.*, 125 F.3d at 1219. But we disagree with the district court's assessment of whether that presumption was sufficiently rebutted.

Align asserted that its business reason for terminating interoperability was to strengthen its position in the patent litigation against 3Shape. But Plaintiffs' patent expert testified that the termination of interoperability "*weakened* Align's position in the patent litigation and *strengthened* 3Shape's equitable defenses." Most of 3Shape's equitable defenses were based on Align's decision to *enter* into an interoperability agreement with 3Shape in the first place, which 3Shape claimed led it to believe that Align did not intend to enforce its patent rights. Those defenses, the expert explained, would have been available regardless of whether Align terminated the agreement.

According to Plaintiffs' expert, Align's decision to terminate interoperability did not strengthen its rebuttal to 3Shape's remaining equitable defenses of unclean hands and patent misuse. Because the unclean hands defense evaluates the patent holder's pre-litigation conduct with respect to the patents it seeks to enforce, whether Align continued

interoperability during the patent litigation would have been irrelevant. As to the patent-misuse defense, the termination of the agreement actually weakened Align's position because the defense was based on the same antitrust theory underlying this case, and Align's termination of interoperability allowed 3Shape to argue that Align terminated the parties' agreement for an anticompetitive purpose. Notably, Align's patent expert did not dispute Plaintiffs' expert's assessment of the effect of the termination on the patent-misuse defense.

In sum, Plaintiffs' unrebutted expert testimony demonstrated that terminating interoperability would, on balance, *strengthen* 3Shape's equitable defenses in the patent litigation and *weaken* Align's position. A juror could reasonably credit this testimony and infer that a justification that weakened the defendant's own patent rights did not "legitimately promote competition." This showing is sufficient to rebut the presumption that the patent litigation was a legitimately procompetitive justification and to create a genuine factual dispute.

Our reasoning mirrors the Supreme Court's in *Kodak*, which held that Kodak's proffered reasons for preventing customers from using independent service organizations (ISOs) to service Kodak equipment did not warrant summary judgment. 504 U.S. at 483. Kodak asserted that it took this action to "control inventory costs." *Id.* at 484. The Supreme Court held that a triable dispute remained in part because a reasonable juror could infer that the justification did not legitimately promote competition, as Kodak's conduct could not yield greater efficiency: "Presumably, the inventory of parts needed to repair Kodak machines turns only on breakdown rates, and those rates should be the same whether Kodak or ISO's perform the repair." *Id.* at 484–85. Kodak

also asserted that it took this action "to prevent ISOs from free-riding on Kodak's capital investment in equipment, parts[,] and service." *Id.* at 483. The Supreme Court held that this justification did not entitle Kodak to summary judgment, either, as "one of the evils proscribed by the antitrust laws is the creation of entry barriers to potential competitors by requiring them to enter two markets simultaneously." *Id.* at 485. In other words, it was not legitimately procompetitive as a matter of law.

Plaintiffs have thus raised a genuine dispute as to whether Align's justification—the patent litigation—legitimately promoted competition.

2. Whether the Justification Is Pretextual

Plaintiffs have also raised a genuine dispute as to whether Align's justification for terminating interoperability was pretextual. The district court concluded that the fact that 3Shape asserted the equitable defenses Align had anticipated is evidence that Align's reason for termination was not pretextual. In the court's view, "[t]he possibility that certain defenses, however weak, could be asserted against Align based on the interoperability agreement, and the fact that the defenses Align anticipated were indeed asserted, is strong evidence of a legitimate business purpose behind the termination of the agreement."

We disagree. What matters at this stage of the analysis is whether Align's real motive for terminating interoperability was to strengthen its position in the patent litigation. If terminating interoperability did not strengthen Align's position, a trier of fact could reasonably infer that this was not Align's purpose at all. *Cf. Nw. Wholesale Stationers, Inc. v. Pac. Stationery & Printing Co.*, 472 U.S. 284, 297 n.7 (1985) ("If [a defendant's] action were not substantially

related to the efficiency-enhancing or procompetitive purposes that otherwise justify [its] practices, an inference of anticompetitive animus might be appropriate").

*Kodak* is once again instructive. There, the Supreme Court held that a reasonable juror could infer that Kodak's justification of "controlling inventory costs" was pretextual, given that its "actions appear[ed] inconsistent with any need to control inventory costs." 504 U.S. at 484. Further, the Supreme Court concluded that Kodak's alternative justification of maintaining high quality service was insufficient to grant Kodak summary judgment, as the plaintiff ISOs had created a genuine dispute as to pretext, given the inconsistencies between the justification and Kodak's other actions. *Id.* at 483–84. Similarly, here, crediting the patent expert's testimony, we hold that a reasonable juror could find that the patent litigation was not Align's real reason for terminating interoperability because it was inconsistent with strengthening Align's patent rights.

Besides the patent expert's testimony, Plaintiffs also presented circumstantial evidence that the patent justification was merely a disguise for an anticompetitive motive. For example, shortly after the termination, an internal Align email celebrated Align's growing revenue figures, and one executive responded, "Wow. Cutting [off] 3shape really worked." An internal presentation a few months later observed, "No 3-Shape interoperability eliminates primary competition." Later, Align's Chief Financial Officer wrote to the CEO to suggest that the company "[s]top litigation, but don't reinstate interoperability." (emphasis omitted).

In addition, the timing of the patent litigation also supports an inference that it was not Align's true motive.

According to Plaintiffs, Align knew about the availability of patent claims against 3Shape as early as 2015. But Align waited until 2017 to initiate the patent litigation, around the same time as the expiration of key Invisalign patents and after 3Shape rejected Align's several attempts at establishing exclusivity. The timing is especially suspect given that interoperability was well under way and Invisalign case submissions through 3Shape's TRIOS scanner had been steadily increasing at the time of the termination.

To be sure, there are multiple ways of interpreting the circumstantial evidence, and the evidence is susceptible to reasonable explanations that support Align's contemporaneous, publicly stated patent justification. But at summary judgment, where we must view the evidence in the light most favorable to Plaintiffs, a reasonable factfinder could conclude that Align used the patent litigation as an excuse to terminate interoperability because it wanted to thwart threats from other clear aligners that could leverage 3Shape's open system to compete with Invisalign, which no longer enjoyed robust patent protection. Plaintiffs have raised a genuine issue of fact as to pretext.

## IV

Because it will be relevant to proceedings on remand, we briefly address Plaintiffs' contention that the district court erred in denying discovery into the legal advice underpinning Align's termination of interoperability. Align objected to an interrogatory about the reason for terminating interoperability, claiming that the answer was protected by the attorney-client privilege. Align's CEO, Joseph Hogan, later testified at his deposition that he faced a "binary decision" and that after filing the patent litigation against 3Shape, he "didn't have the optionality of maintaining that

kind of interoperability relationship with 3Shape." When Plaintiffs asked Hogan "who supplied [him] with that information . . . that it was a binary decision," Align objected on the basis of attorney-client privilege. The district court sustained Align's claims of privilege.

Plaintiffs moved to preclude Align's argument that it "terminated interoperability to protect its patent interests." The district court denied the motion after Align explained that it intended to rely only on objective evidence, not subjective beliefs about the merits of patent-law defenses. But at summary judgment, Align cited Hogan's testimony, explaining that after Align filed the patent litigation, Hogan "determined that continuing to accept scans from TRIOS scanners could fatally compromise Align's patent claims against 3Shape."

Align waived the attorney-client privilege by relying on Hogan's testimony. We have held that the privilege "may not be used both as a sword and a shield." *Chevron Corp. v. Pennzoil Co.*, 974 F.2d 1156, 1162 (9th Cir. 1992). An implied waiver of the privilege occurs when "(1) the party asserts the privilege as a result of some affirmative act, such as filing suit; (2) through this affirmative act, the asserting party puts the privileged information at issue; and (3) allowing the privilege would deny the opposing party access to information vital to its defense." *Home Indem. Co. v. Lane Powell Moss & Miller*, 43 F.3d 1322, 1326 (9th Cir. 1995).

Here, Align affirmatively put at issue privileged information about its subjective intent by claiming at summary judgment that "Hogan testifie[d] that . . . if he [didn't] terminate," he would jeopardize "enforcement of these patents." *See United States v. Bilzerian*, 926 F.2d 1285,

1292 (2d Cir. 1991) ("A [party] may not use the privilege to . . . disclose some selected communications for self-serving purposes."). And the privileged information was vital to Plaintiffs' rebuttal. If, for example, Hogan received legal advice contrary to what he suggested in his testimony, then that could be strong evidence of pretext. Indeed, Align emphasized that Plaintiffs produced no evidence contradicting Align's theory that Hogan acted based on his view of how best to advance the company's litigation interests. At the summary judgment hearing, it argued that "Align sued, then terminated interoperability weeks later after it determined that . . . 3Shape could end these suits with the assertion of these equitable defenses," but "there's no document that says, 'Hey, let's use the enforcement of these patents to finally terminate interoperability.'" Having advanced that theory, Align may not "invoke the attorney-client privilege to prevent [Plaintiffs] from examining the situation further." *United States v. Amlani*, 169 F.3d 1189, 1195 (9th Cir. 1999).

On remand, if Align continues to rely on Hogan's claim that he made his termination decision based on his view of how that decision would affect the patent litigation, then the district court should reopen discovery and require Align to produce materials within the scope of the implied waiver.

V

The refusal-to-deal claim is part of Plaintiffs' broader allegation that Align engaged in an anticompetitive scheme in violation of section 2. That alleged scheme consisted of Align's termination of interoperability, bundling of Invisalign and iTero sales through the Fusion program, and exclusionary contracts. The district court evaluated the refusal-to-deal claim on its own and did not address bundling

and exclusive dealing as independent claims, reasoning that "[a]lthough the remainder of Align's allegedly anticompetitive actions might have combined with the refusal-to-deal claim to form the basis of a larger antitrust claim, they cannot stand on their own." Plaintiffs did not assert standalone bundling and exclusive-dealing claims in the district court, so we do not address them. *See Endy v. County of Los Angeles*, 975 F.3d 757, 768 n.5 (9th Cir. 2020).

Nevertheless, we recognize that Plaintiffs have made arguments in support of a section 2 claim based on what they call the "overall combined effect" of individual monopolistic acts. *City of Anaheim v. S. Cal. Edison Co.*, 955 F.2d 1373, 1376 (9th Cir. 1992). They have submitted expert calculations on the discounts offered through the Fusion bundling program to show that Align "sold the competitive product or products below its average variable cost of producing them." *Cascade Health Sols. v. PeaceHealth*, 515 F.3d 883, 910 (9th Cir. 2008). And they have identified contracts with exclusivity clauses, which could serve as evidence of "conduct that is clearly threatening to competition or clearly exclusionary" in violation of section 2. *Twin City Sportserv., Inc. v. Charles O. Finley & Co.*, 676 F.2d 1291, 1309 (9th Cir. 1982). Together with Align's refusal to deal, the bundling and exclusive dealing may contribute to an overall anticompetitive scheme. The Fourth Circuit has held that "when a plaintiff alleges that a scheme or course of conduct was anticompetitive, the scheme or conduct must be considered as alleged, not in manufactured subcategories." *Duke Energy Carolinas, LLC v. NTE Carolinas II, LLC*, 111 F.4th 337, 355 (4th Cir. 2024).

We have not previously considered whether a plaintiff may pursue a section 2 claim based on an overall scheme,

independent of its specific components, and we need not do so now. Because we reverse the grant of summary judgment on the refusal-to-deal claim, and because the briefing and the record on the scheme claim are limited at this stage, we leave it to the district court to determine in the first instance how to resolve whatever additional claims it finds have been preserved and are properly presented to it.

**REVERSED and REMANDED.**

---

MILLER, Circuit Judge, concurring in the judgment:

Refusal-to-deal liability under section 2 of the Sherman Act, 15 U.S.C. § 2, is a limited exception to the general rule that businesses have no duty to cooperate with their rivals. The Supreme Court has warned us to be "very cautious in recognizing" refusal-to-deal claims. *Verizon Commc'ns Inc. v. Law Offs. of Curtis V. Trinko, LLP*, 540 U.S. 398, 408 (2004). When a refusal to deal is based on "a legitimate business justification," there is no section 2 liability. *Image Tech. Servs., Inc. v. Eastman Kodak Co.*, 125 F.3d 1195, 1212 (9th Cir. 1997). Today, however, the court holds that even if a refusal to deal has a legitimate business justification, a plaintiff can prevail whenever a jury thinks that "the anticompetitive harm of the refusal to deal outweighs any competitive benefit." That is a significant and unwarranted expansion of refusal-to-deal liability.

The law has long recognized that businesses enjoy the right to refuse to deal with anyone, including their rivals. *See United States v. Colgate & Co.*, 250 U.S. 300, 307 (1919). That rule makes good sense because compelling rivals to share their competitive advantages not only "requires

antitrust courts to act as central planners, identifying the proper price, quantity, and other terms of dealing—a role for which they are ill suited"—but also "may facilitate the supreme evil of antitrust: collusion." *Trinko*, 540 U.S. at 408; *see also* Frank H. Easterbrook, *The Chicago School & Exclusionary Conduct*, 31 Harv. J.L. & Pub. Pol'y 439, 442 (2008).

The district court held that as long as the defendant offers a valid business justification that the plaintiff cannot rebut as pretextual or anticompetitive, then the defendant's refusal to deal with its rivals does not violate section 2. Plaintiffs suggested that the court should balance the anticompetitive harms of the defendant's conduct against its procompetitive benefits, and that a section 2 claim exists if the harms outweigh the benefits. The district court declined to require such balancing, reasoning that "[a] refusal to deal that is based in part on legitimate business reasons does not violate the antitrust laws, even if it is also motivated by the desire to harm competitors or does in fact harm competitors." American Bar Ass'n, *Model Jury Instructions in Civil Antitrust Cases*, ch. 3.B.2, at 129 (2016).

The district court correctly stated the law. The Supreme Court has never required balancing procompetitive gains against anticompetitive harms when a business refuses to deal with its rivals. Rather, the Court has emphasized that liability for refusal to deal turns on the presence or absence of a legitimate business justification. In *Aspen Skiing Co. v. Aspen Highlands Skiing Corp.*, the Court approved of jury instructions stating categorically that "if there were legitimate business reasons for the refusal, then the defendant . . . has not violated the law." 472 U.S. 585, 597 (1985). The Court explained that the "most significant" factor in its decision to affirm a verdict for the plaintiff was

Ski Co.'s failure to "persuade the jury that its conduct was justified by *any* normal business purpose." *Id.* at 608 (emphasis added); *see id.* (noting "Ski Co.'s failure to offer any efficiency justification whatever for its pattern of conduct"). As leading commentators have observed, "the Court did not call for any balancing of the social gains from refusing to deal or cooperate with rivals based on legitimate business purposes against the losses resulting from that refusal." 3B Philip E. Areeda & Herbert Hovenkamp, *Antitrust Law: An Analysis of Antitrust Principles & Their Applications* ¶ 772c2, at 225–26 (5th ed. 2022).

The Supreme Court has described *Aspen Skiing* as a "limited exception" that exists "at or near the outer boundary of § 2 liability." *Trinko*, 540 U.S. at 409; *see FTC v. Qualcomm Inc.*, 969 F.3d 974, 993 (9th Cir. 2020) ("The one, limited exception to [the] general rule that there is no antitrust duty to deal comes under the Supreme Court's decision in *Aspen Skiing*."); Easterbrook, *supra*, at 442 (describing *Aspen Skiing* as "the last gasp of the old school of antitrust"). And it has warned courts to treat refusal-to-deal claims with caution, given "the uncertain virtue of forced sharing and the difficulty of identifying and remedying anticompetitive conduct by a single firm." *Trinko*, 540 U.S. at 408. Consistent with that admonition, we have read *Aspen Skiing* as recognizing that monopolists may refuse to aid their competitors "based partially on a desire to restrict competition," as long as their conduct is justified by a legitimate business reason. *Oahu Gas Serv., Inc. v. Pacific Res., Inc.*, 838 F.2d 360, 368 (9th Cir. 1988); *accord Image Tech. Servs., Inc.*, 125 F.3d at 1212 ("When a legitimate business justification supports a monopolist's exclusionary conduct, that conduct does not violate § 2 of the Sherman Act."); *Aerotec International, Inc. v. Honeywell*

*International, Inc.*, 836 F.3d 1171, 1184 (9th Cir. 2016) ("[T]here is only a duty not to refrain from dealing where the only conceivable rationale or purpose is 'to sacrifice short-term benefits in order to obtain higher profits in the long run from the exclusion of competition.'" (quoting *MetroNet Servs. Corp. v. Qwest Corp.*, 383 F.3d 1124, 1132 (9th Cir. 2004))).

The court today asserts that a rule of balancing is "likely obvious from our case law." In support of that proposition, it cites unreasoned dicta from our decision in *Qualcomm*, in which we said that "[i]f the plaintiff cannot rebut the monopolist's procompetitive justification, 'then the plaintiff must demonstrate that the anticompetitive harm of the conduct outweighs the procompetitive benefit.'" 969 F.3d at 991 (quoting *United States v. Microsoft Corp.*, 253 F.3d 34, 59 (D.C. Cir. 2001)). That case did not apply a rule of balancing, let alone articulate the basis for such a rule or explain how it could be reconciled with Supreme Court precedent. The court points to our statement in *Qualcomm* that the "test under the rule of reason is essentially the same" for claims brought under sections 1 and 2. 969 F.3d at 991. But in *Qualcomm*, we addressed several different section 1 and section 2 claims, and although some of those claims were indeed subject to the rule of reason—and, thus, balancing of procompetitive benefits against anticompetitive harms—we did *not* apply balancing in our analysis of the refusal-to-deal claim. *See id.* at 993–95. Rather, we simply held that Qualcomm was under no "antitrust duty to license rival chip manufacturers" because "none of the required elements for the *Aspen Skiing* exception [were] present." *Id.* at 995. We reasoned that Qualcomm was motivated by greater profits in both the short and long term "regardless of any impacts on competition." *Id.* at 994. We did not weigh

Qualcomm's gains against its competitors' losses. Our discussion of the rule of reason was directed at evaluating *other* anticompetitive conduct under section 2, as well as claims like exclusive dealing that are also viable under section 1. *Id.* at 995, 1003.

The court also points to a stray line in the Areeda and Hovenkamp treatise remarking that a refusal-to-deal claim under section 2 might lie if the defendant "injures an actual or prospective rival . . . with a business justification that is . . . wholly disproportionate to the harm that is inflicted." Areeda & Hovenkamp, *supra*, ¶ 772c2, at 226. The treatise does not explain the theoretical basis for such liability, and in any event, a limited exception for "wholly disproportionate" anticompetitive harm is a far cry from allowing a plaintiff to prevail merely by showing that anticompetitive harm outweighs the procompetitive benefit.

Nor does the Supreme Court's decision in *Eastman Kodak Co. v. Image Technical Services, Inc.*, suggest that balancing is appropriate. 504 U.S. 451 (1992). Although the Court stated that Kodak might prevail at trial by showing that "any anti-competitive effects of Kodak's behavior are outweighed by its competitive effects," *id.* at 486, the opinion makes clear that such weighing was part of the section 1 analysis, *see id.* at 479, not the refusal-to-deal analysis. Nothing in *Kodak* suggests that a proffered procompetitive reason for a refusal to deal must be undiluted by other motives or that it must have benefits that outweigh its costs. Rather, under *Kodak*, a proffered reason must be "valid" in the sense that it is a genuine reason for the defendant's decision and is procompetitive. *See, e.g.*, 504 U.S. at 484 (rejecting a proffered justification of "controlling inventory costs" as pretextual given that "Kodak's actions appear inconsistent with any need to control inventory

costs”); *id.* at 485 (rejecting a proffered justification of preventing “free-riding” because it amounted to “the creation of entry barriers to potential competitors”).

Finally, the court cites the Seventh Circuit’s decision in *Viamedia, Inc. v. Comcast Corp.*, 951 F.3d 429 (7th Cir. 2020). But to the extent *Viamedia* endorsed balancing harms against benefits in conducting the refusal-to-deal inquiry, its discussion of balancing was unnecessary to the disposition and provides little reason to adopt a general balancing rule in every refusal-to-deal case. It appears that the Seventh Circuit has not read *Viamedia* to establish such a rule, nor has any other circuit.

To return to the point with which I began, “the general rule is firm independence and refusal to deal doctrine exists only to address one of the most obvious exceptions to that general rule.” *Novell, Inc. v. Microsoft Corp.*, 731 F.3d 1064, 1076 (10th Cir. 2013) (Gorsuch, J.). Refusal-to-deal liability under *Aspen Skiing* is a limited exception, available only when “the monopolist’s conduct [is] irrational but for its anticompetitive effect.” *Id.* at 1075.

The court today expresses concern about evidentiary requirements that might make it “virtually impossible [for refusal-to-deal plaintiffs] to win.” (quoting Erik Hovenkamp, *The Antitrust Duty to Deal in the Age of Big Tech*, 131 Yale L.J. 1483, 1497 (2022)). But current law allows plaintiffs to prevail by rebutting a defendant’s proffered business justification as pretextual or anticompetitive. It may be that *Aspen Skiing* is “underinclusive to some degree” in the sense that it permits some refusals to deal that cause anticompetitive harms with little offsetting benefit. *Novell, Inc.*, 731 F.3d at 1076. Even so, some underinclusivity is far preferable to the

freewheeling balancing rule endorsed by the court today, which risks transforming virtually every refusal-to-deal claim into an inquiry into whether the defendant's asserted business justification outweighs the harm to competition—effectively requiring courts to balance the costs and benefits of unilateral business decisions that antitrust law ordinarily leaves to the marketplace.

As the Supreme Court reminded us in *Trinko*, judges lack the institutional competence to function as central planners, and we should be wary of the prospect of "[m]istaken inferences and . . . resulting false condemnations," which in this context "'are especially costly, because they chill the very conduct the antitrust laws are designed to protect.'" 540 U.S. at 414 (quoting *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 594 (1986)); *see also St. Luke's Hosp. v. ProMedica Health Sys.*, 8 F.4th 479, 486 (6th Cir. 2021) ("Forcing rivals to share—to continue doing business together—pushes the bounds of our expertise, and '[w]hen it comes to fashioning an antitrust remedy' in this area, 'caution is key.'" (quoting *NCAA v. Alston*, 141 S. Ct. 2141, 2166 (2021))); Easterbrook, *supra*, at 442 ("Anyone who thinks that judges would be good at detecting the few situations in which cooperation would do more good than harm has not studied the history of antitrust."); *Novell*, 731 F.3d at 1073 (discussing the same considerations in the context of a secondary refusal to deal).

* * *

As the district court recognized, this is a close case on the facts. On balance, I believe that plaintiffs presented sufficient evidence to create a genuine dispute of material fact on whether Align's proffered justification for terminating interoperability was pretextual—and, thus, that

no legitimate business justification existed. I therefore agree with today's decision that the district court erred in granting summary judgment to Align on the section 2 refusal-to-deal claim and that the case should be remanded for trial. But because I do not agree with today's expansion of the legal standard for refusal-to-deal claims, I concur only in the judgment.